IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SAMEH HANNA,                          )
                                      )
        Plaintiff,                    )
                                      )        NO. 3:18-cv-00325
v.                                    )        JUDGE RICHARDSON
                                      )
MARRIOTT HOTEL SERVICES INC.,         )
MARRIOTT INTERNATIONAL INC.           )
                                      )
        Defendants.                   )


## MEMORANDUM OPINION

This case involves the applicability, to a group of banquet staff members employed by

Marriott Hotel Services Inc. ("MHS"), of the current version of the "retail or service

establishment" exemption to the overtime provisions of the Fair Labor Standards Act. Pending

before the Court are the two side's cross-motions for summary judgment. (Doc. Nos. 206, 209).

For the reasons stated below, Defendants' motion for summary judgment (Doc. No. 209) will be

GRANTED and Plaintiff's motion for summary judgment (Doc. No. 206) will be DENIED.

## FACTS

The Court concludes that all facts necessary for the Court to resolve this case as a matter

of law are not in genuine dispute, and that each of the cross-motions can be resolved as a matter

of law based on those undisputed facts. More specifically, each cross-motion turns on a question

of statutory interpretation, *i.e.,* the applicability or inapplicability of the (statutory) "retail or

service establishment" exemption in light of the undisputed facts that are set forth in this section

beginning with the following paragraph.

Defendant Marriott Hotel Services Inc. ("MHS") is a wholly owned subsidiary of Defendant Marriott International Inc. ("MII"). (Doc. No. 221 at 5). The Gaylord Opryland Resort & Convention Center ("the Gaylord")[1] is a large hotel located in Nashville Tennessee and is owned by Ryman Hospitality Properties Inc. ("Ryman"), a company legally unrelated to MHS. (Doc. No. 217 at 2).

MHS manages the Gaylord for Ryman. (Doc. No. 221 at 2). In exchange, MHS receives from Ryman a guaranteed base management fee and, under certain circumstances, an incentive management fee. (*Id.* at 3). The base management fee is calculated as a percentage of the gross revenue generated at the Gaylord. MHS receives the incentive management fee only if MHS reaches a particular profit threshold through its operations at the Gaylord. (*Id.*).

MHS manages all operations at the Gaylord, including selling (or renting) goods and services, such as guest rooms, food and beverages, and banquet events. (*Id.* at 2, 6–9). Each banquet customer enters into a contract with MHS for banquet services, and employees of MHS serve as the staff. (Doc. No. 222 at 4). Each contract includes a mandatory banquet service charge, which is either 24% or 25% of the total food and beverage costs charged to the banquet customer. (Doc. No. 221 at 11). The service charge is divided up by MHS, with MHS retaining 45% and allocating the remaining 55% to the banquet staff members. (*Id.* at 13–14). The 55% portion of the

---

[1] In "Plaintiff's Response to Defendants' Statement of Undisputed Facts," (Doc. No. 221), Plaintiff repeatedly asserts that it is improper for "Defendants [to] attempt to define the 'Hotel' as the Gaylord Opryland Resort & Convention Center, which as defined is not a legal entity." (*E.g.,* Doc. No. 221, at 1–3). Although Plaintiff's point here is not entirely clear, the point appears to be that Defendant is incorrect to frame various purported facts in terms of a "convention center" or hotel—each of which is a *physical facility* rather than a *legal entity*—when the purported fact at issue actually should be phrased in a terms of a legal entity associated with the convention center/hotel. The Court certainly understands the distinction between a legal entity and a physical facility. Plaintiff, however, provides the Court with no explanation as to the significance of this distinction within the context of the parties' arguments, and the Court is not aware of any import this distinction has on its analysis.

service charge is distributed proportionally among banquet staff members based on the respective number of hours they worked that week.[2] (*Id.*).

MHS receives payment from each banquet customer, which is then placed into a Marriott Business Services bank account. (*Id.* at 3). The revenue received from the banquets at the Gaylord is earmarked in the account for "the Hotel" (meaning, presumably, the Gaylord, although the parties are unclear about this). (*Id.*). MHS remits to Ryman the profits from the banquet revenue, less the base management fee and, if applicable, the incentive management fee. (Doc. No. 222 at 5).

The Gaylord is a popular attraction in Nashville, Tennessee and is open to the general public. (Doc. No. 221 at 6, 7). It is commonly used as a venue for large-scale events, including banquets. (*Id.* at 6). During the relevant time period, direct sales of goods and services to end customers at the Gaylord constituted over 98% of total annual sales.[3] (*Id.* at 10).

The sole original (and named) Plaintiff, Sameh Hanna, is a former employee and banquet-staff member of MHS. (*Id.* at 2). From March 2015 to October 23, 2020, Plaintiff served as a Banquet Captain and Senior Banquet Captain. (*Id.*). During Plaintiff's employment with MHS as part of the banquet staff, Plaintiff's compensation structure consisted of two inputs: 1) an hourly wage; and 2) his share of the distribution of the 24% or 25% service charge collected from banquet customers, *i.e.*, his portion of the 55% of the service charge that is distributed among banquet staff members. (*Id.* at 13–14).

---

[2] The Court notes that although its use of the past tense refers to the facts pertaining to Plaintiff's employment by MHS, any use of the present tense should be understood as applying to all times material to the parties' cross-motions for summary judgment.

[3] The parties do not specify the "total annual sales" to which they refer here; one suspects that they are referring to MHS's total annual sales made on the premises at the Gaylord, but such an interpretation leaves one to wonder to whom the other 2% of annual sales was made; perhaps it was made directly to Ryman for some purpose.

Other than on one occasion, which is not material here, Plaintiff did not receive overtime payment while employed by MHS as a banquet staff member. (*Id.* at 20).

<u>PROCEDURAL BACKGROUND</u>

Plaintiff brought this action against MII and MHS as a collective action under the Fair Labor Standards Act ("FLSA"),[4] seeking overtime pay for the relevant time period on behalf of himself and others similarly situated to him. (Doc. No. 1). After filing an amended complaint (Doc. No. 15), Plaintiff thereafter moved for conditional certification of a class (also known as a "collective" in the context of FLSA collective actions) comprising himself and those similarly situated, and for court-authorized notice to those similarly situated, pursuant to 29 U.S.C. § 216(b). (Doc. No. 79). The Court granted that motion in part, certifying a particular defined class and authorizing notice to members of the class. (Doc. No. 127).

Thereafter, the Court amended and clarified the scope of the class as originally defined, such that the class is now defined as "all banquet staff employees of Defendants at the Gaylord Opryland Resort and Convention Center in Nashville, Tennessee, who: (1) worked more than 40 hours per week for Defendants in the three-year period preceding the Court's entry of this Order; (2) were classified as "exempt" by Defendants pursuant to 29 U.S.C. § 207(i); and (3) were compensated through the fixed hourly rate plus service charge distribution (characterized by Plaintiff as the 'variable hourly rate') compensation plan under which Plaintiff was paid." (Doc. No. 150 at 1-2). Subsequently, more than 100 class members consented to joining this action with the original Plaintiff as so-called "opt-in" Plaintiffs, although six thereafter were dismissed upon motion of Defendants for failing to participate in discovery as required. (Doc. No. 241). (Herein,

---

[4] The FLSA is codified at 29 U.S.C. § 201 *et seq.* The provision authorizing collective actions under the FLSA is 29 U.S.C. § 216(b).

the Court refers primary, though not exclusively, to "Plaintiff" rather than "Plaintiffs" even when the reference applies equally to the opt-in Plaintiffs).

<u>SUMMARY JUDGMENT STANDARDS</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for

example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[5] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322–23; *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849–50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—

---

[5] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

This case presents the unusual scenario in which no material facts are disputed by the parties. The only questions yet to be resolved are questions of law for the Court—regarding the proper construction of the "retail or service establishment" exemption and its applicability or inapplicability to Plaintiff—to be answered in light of the undisputed facts. *See Ramadan v. Gonzales,* 479 F.3d 646, 648 (9th Cir. 2007) ("A 'question of law' includes an issue of statutory construction as well as the application of law to undisputed facts."); *Union Mfg. Co. v. N.L.R.B.*, 221 F.2d 532, 533 (D.C. Cir. 1955) ("The facts were stipulated, and the question before us is a question of law, one of statutory construction."). Thus, this case is particularly apt for resolution on summary judgment. *See AKF, Inc. v. Western Foot & Ankle Center*, 2022 WL 4538869, at *5 (E.D.N.Y. Sept. 28, 2022) ("It is well-established that the Court may decide all questions of law on summary judgment.").

DISCUSSION

The Foreign Labor Standards Act (29 U.S.C. §§ 201 *et. seq.*, "FLSA") was originally passed in 1938 with the purpose of "eliminat[ing] 'labor conditions detrimental to the maintenance of the minimum wage standard of living necessary for health, efficiency, and general well-being of workers' engaged in interstate commerce." *See Kelly v. A1 Technology*, 2010 WL 1541585, at *6 (S.D.N.Y. Apr. 12, 2010) (quoting 29 U.S.C. § 202(a)); 29 U.S.C. § 201. Generally, the FLSA requires (via what the Court will call herein the "overtime-payment requirements") employers to provide overtime payment to an employee who works more than forty hours in a week. 29 U.S.C. § 207(a)(1). However, there are several exceptions to the overtime-payment requirements. As

relevant here, 29 U.S.C. § 207(i) exempts "employees of a retail or service establishment" (hereinafter, "§ 7(i) retail-or-service exemption")[6] who are compensated under a particular pay structure. Specifically, the § 7(i) retail-or-service exemption states in full:

> No *employer* shall be deemed to have violated subsection (a) *by employing any employee of a retail or service establishment* for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i) (emphasis added)[7].

The parties have filed a joint stipulation wherein they

> agree that, pursuant to Section 7(i), employees are exempt from [the overtime-payment requirements] when the following three requirements are met:
>
> 1. the employee is employed by a "retail or service establishment";
>
> 2. the employee is paid a regular rate of more than one and one-half times the federal minimum wage; and
>
> 3. the employee receives more than half of his or her compensation during a representative period (of not less than a month) in the form of commissions earned from the sale of goods or services.

29 C.F.R. § 779.412.

---

[6] Outside the context of the term that the Court here has just coined, the Court uses "§ 207(i)" interchangeably with "§ 7(i)," as each term refers to the same provision. The latter refers to the (sub)section of the Fair Labor Standards Act itself wherein this provision is found, and the former refers to the section in Title 29 of the U.S. Code where it has been codified.

[7] It is notable that the phrase "retail or service establishment" is somewhat of a misnomer. As the DOL regulations make clear, § 207(i) exempts employees of an establishment that provides goods or services that are retail in nature. *See* 29 C.F.R. § 779.322. The phrasing of § 207(i), however, could lead the reasonable reader to believe that employees of an "establishment" that provides services may be eligible for the exemption even if those services are not considered "retail" services. Therefore, the more accurate phrasing would be "retail-goods or retail-services establishment," and this is how the Court understands the phrase "retail or services establishment."

(Doc. No. 224 at 1-2).[8] The Court accepts this stipulation, concluding that it accurately reflects prevailing law, with one qualification: the Court will construe the first requirement to be that the employee is an *employee of* a "retail or service establishment." The Court thus accounts for any conceivable substantive distinction between being "employed by" something and being an "employee of" something, the latter of which is the terminology used in the § 7(i) retail-or-service exemption.

With this qualification, the upshot of the parties' stipulation in the present case is that Plaintiff is exempt from the overtime-payment requirements if the following three requirements are met: (1) Plaintiff is an employee of a "retail or service establishment"; (2) Plaintiff is paid a regular rate of more than one and one-half times the federal minimum wage; and (3) Plaintiff receives more than half of his compensation during a representative period (of not less than a month) in the form of commissions earned from the sale of goods or services. Plaintiff does not dispute that the second requirement is satisfied in this case; the dispute here is over the first and third requirements.

To properly resolve the parties' pending cross-motions, the Court must first answer a pair of questions that drive the determination of whether the § 7(i) retail-or-service exemption applies in this case. First, the Court must answer a question of first impression in this circuit. Namely, the

---

[8] The parties are careful to note that:

> Nothing in this stipulation constitutes a stipulation or an admission by Plaintiffs that the payments at issue in this case, i.e., those distributed from the service charge pool, constitute "commissions" within the meaning of 29 C.F.R. § 779.412(3). However, Plaintiffs stipulate that Defendants have satisfied subsections 2 and 3 above if the Court concludes that such payments are "commissions."

(Doc. No. 224 at 2).

Court must determine what it is that constitutes the "establishment" under § 207(i) when the employer seeking the § 7(i) retail-or-service exemption for particular employees provides goods and services on the physical premises owned or leased by another party that contracts with the employer for the provision of those goods and services. . This determination—which entails consideration of whether the "establishment" is the employer, or the premises, or the employer's particular business (unit) providing services at those premises—is necessary to deciding whether Plaintiff is an employee of a "retail or service establishment," so as to satisfy the first of the three requirements for the § 7(i) retail-or-service exemption to apply. Additionally, the Court must determine whether Plaintiff's compensation in the form of a portion of the service charge constitutes a "commission" within the meaning of § 207(i).[9] This determination is necessary to deciding whether Plaintiff received more than half of his compensation (during a relevant period) in the form of commissions earned from the sale of goods or services, so as to satisfy the third of these requirements.

As to the first question, the Court finds that *MHS' business at the Gaylord* is the relevant "establishment" of which Plaintiff is an employee for purposes of the § 7(i) retail-or-service exemption. The Court also finds that Plaintiff is compensated in part by a commission. The section 7(i) retail-or-service exemption therefore applies, and thus MHS is exempt from the overtime-payment requirements with respect to Plaintiff.

1. TENETS OF STATUTORY CONSTRUCTION

When interpreting Section 207(i), the Court keeps in mind that "[t]here is no serious debate about the foundational interpretive principle that courts adhere to ordinary meaning, not literal

---

[9] As indicated above, "Plaintiffs stipulate that Defendants have satisfied [requirements] 2 and 3 above if the Court concludes that such payments [*i.e.*, payments distributed to Plaintiffs from the service charge] are 'commissions.'" (Doc. No. 224 at 2).

meaning, when interpreting statutes." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1825 (2020) (Kavanagh J., dissenting). "To discern that ordinary meaning, th[e] words [of the statute] must be read and interpreted in their context." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1787 (2022) (internal quotation marks omitted). An essential (and primary) aspect of statutory interpretation is determining whether the statute is ambiguous, meaning whether the statutory language "is susceptible of more than one reasonable interpretation." *In re Darvocet, Darvon and Propoxyphene Products Liability Litigation*, 939 F. Supp. 2d 1376, 1379 (Judicial Panel on M.D.L. 2013) (citing *Chao v. Occupational Safety & Health Review Comm'n*, 540 F.3d 519, 524 (6th Cir. 2008)). In determining whether ambiguity exists, the Court is not limited to viewing the words in isolation. Indeed, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). "[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *See Bostock* , 140 S. Ct. at 1750. And "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *See id.*

The undersigned recently noted:

> The Court realizes that the concept of ambiguity can be subjective, in that there is a continuum between what can be called "ambiguous" and what can be called "unambiguous," and in many cases there can be reasonable disagreement about where on the continuum the possibly ambiguous item (such as, in this case, a contract term) falls. That is why, for example, in *Planters Gin Co.*, the learned jurists on the Tennessee Supreme Court came to the opposite conclusion regarding ambiguity than had the learned jurists of the Tennessee Court of Appeals. All of which is to say that sometimes ambiguity is in the eye of the beholder. Be that as it may, it is the Court's job to call it like it sees it, giving a yes/no answer to the question of whether the contract is ambiguous.

*Thornton v. Dutch Nats. Processing, LLC*, No. 3:20-CV-00159, 2022 WL 4359066, at *6 (M.D. Tenn. Sept. 20, 2022) (Richardson, J.). What the Court said in *Thornton* in the context of contract interpretation applies here in the context of statutory interpretation, and the Court will proceed accordingly.

2. DETERMINING WHAT CONSTITUTES THE "ESTABLISHMENT" HERE AT ISSUE

As further discussed in a footnote below, the parties embrace the definition of "retail or service establishment" set forth in 29 C.F.R. § 779.24 and thus agree that a "retail or service establishment" is an establishment 75 percent "of whose annual dollar volume of sales or goods or services (or both) is not for resale and which is recognized as retail sales or services in the particular industry." [10] But that definition leaves open the question of what is meant by "establishment," and the parties disagree on what (and, more, specifically, what entity, business, or place) it is that is the "establishment" that should be subjected to these 75-percent requirements in this case to determine whether Plaintiff is an employee of a "retail or service establishment" as required for the § 7(i) retail-or-service exemption to apply.

Defendants steadfastly maintain that the "establishment" is the Gaylord—the physical premises on which Plaintiff carried out his duties as a banquet staff member. (Doc. No. 222 at 7).

_____

[10] "Retail or service establishment" is not defined in the current version of the FLSA. However, the DOL regulations include, at 29 C.F.R. § 779.24, the definition as it once was contained in the now-repealed Section 13(a)(2) and expressly make that definition applicable to Section 7(i). *See* 29 C.F.R. § 779.411; *Diggs v. Ovation Credit Services, Inc.*, 449 F. Supp. 3d 1280 (M.D. Fla. 2020) ("[C]ourts continue to apply § 213(a)(2)'s definition of retail or service establishment to the commission work exemption [, § 7(i) retail or service exemption]."). As noted above, the parties mutually embrace that definition, and it certainly is not inconsistent with case law from the Sixth Circuit, which has not spoken on the definition of "retail or service establishment" in the FLSA since the definition was removed from the statute. Moreover, several other courts have adopted the definition included in the DOL regulations. *Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529, 537 (N.D. Ill. 2006) (collecting cases). Moreover, the Court finds this definition to be a reasonable construction of the statute. For all of these reasons, the Court will apply it in the current context. In other words, the Court will apply this definition of "*retail or service* establishment" to what the Court has found to be the relevant *establishment, i.e.,* MHS's business at the Gaylord, in light of the undisputed facts regarding that establishment.

In some points in his briefing, Plaintiff appears to agree with Defendants that the Gaylord is the "establishment." (Doc. No. 217 at 6–7 ("Having established the Gaylord as the applicable establishment . . . .")). At other points in his briefing, however, Plaintiff plainly asserts that *MHS* is the relevant "establishment." (Doc. No. 220 at 2 ("To qualify for the 7(i) [retail-or-service] exemption, [MHS] must establish that *it* qualifies as a 'retail or service establishment.'" (emphasis added))). At one point, Plaintiff attempts to reconcile this discrepancy, opining that "[t]he Gaylord . . . would logically serve as the distinct physical place of business from which [MHS] must establish that it operates as a retail or service establishment." (Doc. No. 217 at 6). Ultimately, the Court construes Plaintiff's argument to be that MHS's business at the Gaylord, rather than MHS as a whole, is the relevant "retail or service establishment."

## A. <u>MHS's Business At The Gaylord</u>

The Court agrees with Plaintiff that MHS's business at the Gaylord is the proper "establishment" for purposes of the § 7(i) retail-or-service exemption (and further analysis thereto). The text of the statute and existing case law both support this outcome and militate against Defendants' contrary argument that the establishment is the Gaylord.

In reaching this conclusion, however, the Court must confront the parties' mutual view that in order to be a "retail or service establishment" under § 207(i), something must be a "distinct physical place of business."[11] The meaning of "establishment," however, is not evidenced by the text of the statute; no language within § 207 (or anywhere else in the FLSA, for that matter)

---

[11] For clarification, the Court notes that as far it can tell from Plaintiff's filings, Plaintiff contends both that the Gaylord is the physical establishment for the purposes of the § 7(i) exemption (Doc. No. 220 at 3) *and* that Marriott's business at the Gaylord is the relevant "retail or service establishment" (Doc. No. 217 at 6). Therefore, although Plaintiff's theory is not entirely internally consistent, it appears clear that Plaintiff agrees with Defendant that a "retail or service establishment" under § 7(i) must have some connection to a distinct physical place of business. (Doc. No. 217 at 6) ("Both the Sixth Circuit and the applicable regulations treat the 'establishment' as a distinct physical place of business."). The Court is confident that it has accounted for Plaintiff's views as best as the Court is able to understand them from the briefing.

provides a clear answer as to what "establishment" means within the facts of this case. Further, as demonstrated by the cases discussed below, reasonable minds can differ on what constitutes an "establishment" within different contexts arising under the FLSA.

More fundamentally, the statutory language at a certain level makes no sense. For instance, it refers to an employer employing an employee, then oddly holds out the possibility that the employee could actually be the employee of something other than that employer (which would be the case, as is certainly conceivably under the statutory language, if the "establishment" is not the employer); it also oddly holds out the possibility that an "employee" can be employed by a *place* (as would be the case if, as is conceivable under the statutory language and as the parties suggests at least to a degree, an "establishment" can be a place of business). The meaning of the § 7(i) retail-or-service exemption is therefore ambiguous, and the Court must look beyond the plain text of the statute to decipher its meaning.

Relying on a series of DOL regulations, the parties contend that "establishment" means "distinct physical place of business." (Doc. No. 209-1 at 11, Doc. No. 217 at 6); 29 C.F.R. § 779.23 (citing *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490 (1945)), 29 C.F.R. § 779.203, 29 C.F.R. § 779.303.[12] The DOL regulations themselves, however, do not contemplate the factual scenario before the Court. Further, the case on which the regulations are based, *A.H. Phillips,* presented materially different facts and involved a (prior) version of the retail-or-service exemption, one with

_____

[12] Although the parties do not address the extent to which this Court should defer to the DOL regulations, the Court concludes DOL regulations are not entitled to *Chevron* deference. Several courts have found that "regulations bearing on the term 'retail or service establishment' are not entitled to *Chevron* deference and do not carry the force of law. The interpretations do not bind, but they may persuade, if on analysis they are in fact persuasive." *See English v. Ecolab, Inc.*, 2008 WL 878456, at *7 (S.D.N.Y. Mar. 31, 2008); *Doe v. Butler Amusements, Inc.*, 71 F. Supp. 3d 1125, 1133 (N.D. Cal. 2014); *Chen v. Major League Baseball*, 6. F. Supp. 3d 449, 456 n.4 (S.D.N.Y. 2014). Therefore, to the extent the Court finds pertinent regulations persuasive, it relies on them.

language different from § 207(i). Moreover, the Court is not convinced that *A.H. Phillips*, despite its below-discussed focus on an "establishment" having physical distinctness, created a one-size-fits-all definition of "establishment" for the FLSA. And case law that has followed *A.H. Phillips* appears to support the Court's reluctance to accept such a narrow definition.. Overall, the parties take an approach to the term "establishment" under § 207(i) that is overly narrow and inconsistent with the context and history of the DOL regulations. For these reasons, as discussed more fully directly below, the Court declines to find under the facts of this case that "establishment" for purposes of § 207(i) means "distinct physical place of business," *i.e.*, in this case, the Gaylord. Instead, the Court finds MHS's business at the Gaylord to be the applicable "establishment."

i.   Origin Of The Parties' Definition Of "Establishment"

The definition contained in the regulations and asserted by the parties originates from the Supreme Court decision in *A.H. Phillips*. There, the Court addressed the meaning of the term "establishment" in a since-repealed[13] exemption ("Section 13(a)(2) exemption")—then prescribed in Section 13(a)(2) of the FLSA (29 U.S.C. § 213(a)(2))—which rendered the wage-and-hour provisions of the FLSA inapplicable with respect to "'any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce.'" *See A.H. Phillips*, 324 U.S. at 491 (quoting Section 13(a)(2)).

In *A.H. Phillips*, the petitioner owned and operated an office building, warehouse, and several grocery stores. *See id.* The Administrator of the Wage and Hour Division of the U.S. Department of Labor argued that the petitioner was obligated to pay its employees in the warehouse and office building overtime and could not claim the Section 13(a)(2) exemption for "employees engaged in a[ ] retail or service establishment[ ]." *See id.* at 492–493. By contrast, the

---

[13] Section 13(a)(2) was repealed by Pub. L. 101-157, § 3(c)(1), Nov. 17, 1989, 103 Stat. 939. No provision has ever been inserted into the now-empty Section 13(a)(2) to fill the void there created by that repealment.

petitioner argued that the wholesale operation, office, and retail stores collectively constituted the "establishment," thereby exempting the warehouse and office employees from the requirement of overtime pay rates. *See id.* at 496. The Court sided with the Division, finding that Congress intended "establishment" to mean a "distinct physical place of business" rather than an "entire business or enterprise." *See id.* Considering the structure of the petitioner's business, the Court found that the petitioner's corporation was composed of "49 retail establishments and a single wholesale establishment." *See id*. Because the "employees in question work[ed] in the wholesale establishment," the Section 13(a)(2) exemption did not apply. *See id.*

So it is true that the Court held that "establishment," as used in Section 13(a)(2), meant "distinct physical place of business." *Id.*. But as indicated above, the definition adopted by the Court in *A.H. Phillips* was adopted within the specific context of the wording of Section 13(a)(2) and the facts of *A.H. Phillips*. Unlike § 207(i), which requires that the employee be an "employee *of* a retail or service establishment" for its exemption to apply, Section 13(a)(2) required instead that the employee be "*engaged in* any retail or service establishment" for its exemption to apply. *See* 29 U.S.C. § 207(i); *A.H. Phillips*, 324 U.S. at 490 (quoting 29 U.S.C. § 213(a)(2)) (emphasis added). So in *A.H. Phillips*, given its definition of "establishment," the exemption was described in terms of employees "engaged in" a "distinct physical place of business." This description is somewhat problematic because it is awkward to speak in terms of a person being "engaged in" a physical place. But it is even more awkward to speak in terms of a person being an "employee of" a physical place—which would be the upshot of applying *A.H. Phillips*'s definition to § 207(i) — because physical places (as opposed to sole proprietorships or legal entities such as corporations) do not have employees. As a result, the definition of "establishment" adopted in *A.H. Phillips* does not necessarily (or easily) apply to § 207(i), given the particular wording of § 207(i).

Further, using physical location or separation for the demarcation of an "establishment" is reasonable when differentiating between operations of a multiunit entity, like the (corporate) petitioner in *A.H. Phillips*. *See Wright v. Adventures Rolling Cross Country, Inc.*, 2013 WL 1758815 (N.D. Cal. April 24, 2013) ("Arguably, the only reason for defining 'establishment' as a distinct physical place of business was so that it could be distinguished from an integrated business enterprise . . . . Notably, much of the case law concerning the term 'establishment' focuses on this issue of establishment versus business enterprise."). The definition, however, is of little use when a company contracts to perform services for a different company on the physical premises owned (or perhaps leased) by that other company. It is likely that the Court *in A.H. Phillips* did not consider all hypothetical contexts—and in particular the context currently before the Court— in which the definition might be applied, because a court generally seeks to answer only the questions before it. *See, e.g.*, *Yazoo & M.VR. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 219–220 (1912) ("But this court must deal with the case at hand, and not with imaginary ones.").[14]

---

[14] The DOL regulations seem to contemplate using physical location to define "establishment" primarily in a scenario where a company runs several entities. For example, § 779.303 of the DOL regulations provide a hypothetical to elucidate the differences between establishments that may qualify for the § 7(i) retail-or-service exemption and those that may not within the context of a single multiunit entity:

> For example, a manufacturer may operate a plant for production of its goods, a separate warehouse for storage and distribution, and several stores from which its products are sold. Each such physically separate place of business is a separate establishment. In the case of chain store systems, branch stores, groups of independent stores organized to carry on business in a manner similar to chain store systems, and retail outlets operated by manufacturing or distributing concerns, each separate place of business ordinarily is a separate establishment.

29 C.F.R. § 779.303. As in *A.H. Phillips*, the DOL regulations (which, unlike *A.H. Phillips*, are intended to define "establishment" as it appears in the current statutory language) appear to contemplate a scenario where a multiunit entity has both retail and non-retail operations. Indeed, the hypothetical manufacturer in the DOL regulation is almost factually identical to the petitioner grocery store owner in *A.H. Phillips*; each of them owned a company with retail and nonretail operations, some of which would be eligible for exemptions under the FLSA, and some of which would not. Unlike the petitioner in *A.H. Phillips*, however, which owned and operated the retail stores there at issue, MHS does not own (or lease) the

Moreover, while *A.H. Phillips* relied heavily on the physical separateness of the warehouse and the retail stores in its finding that the operations were all different establishments, the Court gave serious consideration to "economic facts" and functionality. *See A.H. Phillips*, 324 U.S. at 498. Indeed, in reaching its decision, the Court did not rely solely on the physical separateness of the warehouse from the retail stores; instead, it discussed in detail the roles of the warehouse employees and explained why their duties did not entitle the petitioner to the exemption provided in Section 13(a)(2). *See id.* ("These duties, rather, are economically, functionally and physically like those of the independent wholesaler's employees who, when engaged in interstate commerce, are admittedly entitled to the benefits of the Act.").

In the years that followed *A.H. Phillips*, at least one court has treated the physical separateness of a business as merely one possible factor for consideration in determining what constitutes the applicable establishment under Section 13(a)(2). *See Lewis v. Brandt Furniture, Inc.*, 277 F. Supp. 907, 912 (W.D. La. 1967), *aff'd*, 402 F.2d 265 (5th Cir. 1968). As the court in *Lewis* explained:

> To better understand the weight to be given the 'distinct physical place of business' test used in *Phillips*, it just [sic] be remembered that prior to that decision some courts had decided that an 'establishment' might be as complex as an employer's business activity, and that there might be several retail outlets and wholesale warehouses within a single 'establishment.' In short, 'establishment' was equated with 'business,' and so long as the entire business of an employer met the percentage requirements of Section 13(a)(2), that business in its entirety was viewed as a single exempt retail establishment.

*See Lewis*, 277 F. Supp. at 912. According to the court in *Lewis*, the definition set forth in *A.H. Phillips* sought to make "clear that an establishment was a distinct place of business and not a

---

Gaylord; the Gaylord is merely the physical premises on which MHS runs its hotel management business, thereby providing the goods and services that MHS says place Plaintiff within the scope of the § 7(i) retail-or-service exemption. The DOL regulations therefore do not appear to consider a factual scenario like the one in the instant case; they contemplate facts like those in *A.H. Phillips* but go no further.

grouping of businesses," but did not go so far as to state a "conclusive" test to define "establishment." *See id.*; *see also Wirtz v. Keystone Readers Service Inc.*, 418 F.2d 249, 255 (5th Cir. 1969) (explaining that in addition to having a distinct physical character, "[a]n establishment must have some locus; it cannot exist as merely a chimera or a concept."). Ultimately, the court found that the "determination of what constitutes the 'establishment' is a problem to be decided from all the facts of any given case." *See Lewis*, 277 F. Supp. at 912. On appeal, the Fifth Circuit agreed. *See* 402 F.2d at 265–266

The parties would have the Court believe that *A.H. Phillips* stands for the proposition that "establishment" as used in § 207(i) means, in our case, a "distinct physical place of business." As demonstrated, however, *A.H. Phillips* dealt with a materially different set of facts and statutory provision. And the regulatory provisions embracing the definition set forth in *A.H. Phillips* do not appear to contemplate the set of facts before the Court in this case. Moreover, as highlighted by the court in *Lewis* and the Court's analysis in *A.H. Phillips*, there is good reason to believe that *A.H Phillips*'s finding as to the definition of 'establishment' is not as narrow as the parties suggest it is. The Court is therefore satisfied that "establishment," for purposes of § 207(i), does not always refer to a "distinct physical place of business."

ii. Courts Have Embraced A Broader Definition Of "Establishment" Than The One The Parties Mutually Embrace.

Courts confronted with facts similar to those in this case have remained consistent in focusing on the factors of business practicalities and functionality weighed in *A.H. Phillips*, despite not necessarily following *A.H. Phillips*'s notion of an "establishment" as a distinct physical place. In *Wirtz v. Campus Chefs*, 303 F. Supp. 1112 (N.D. Ga. 1968), the defendant contracted with Shorter College to operate the college's two dining facilities, one located on the main campus and the other located inside a hotel used for boarding students. *Id.* at 1114. The college supplied the

defendant with various items (space, utensils, equipment, utilities, maintenance, and janitorial services) needed for providing the food service, but the defendant otherwise had near complete control over the food service. *See id.* at 1115. The defendant argued that it was exempt from the FLSA's minimum-wage and overtime-pay provisions under the original version of Section 13(a)(20), which exempted "any employee of a retail or service establishment who [was] employed primarily in connection with the preparation or offering of food or beverages . . . ." *See id.* at 1114. The court agreed. It first explained that under *A.H. Phillips*, "'[t]he word "establishment" (must be used) as it is normally used in business and in government.'" *Id.* at 1116. (quoting *A. H. Phillips*, 324 U.S. at 496).[15] Just as the court in *A.H. Phillips* focused in part on the functional distinction(s) between the petitioner's retail and non-retail operations, the court in *Wirtz* considered whether the defendant's business was "functionally distinct" from the premises at Shorter College. *Id.* at 1116 (quoting *Mitchell v. Gammill*, 245 F.2d 207 (5th Cir. 1957)). *Accord*, *A.H. Phillips*, 324 U.S. at 497–498. The court reasoned that although the food service operations took place within the confines of Shorter College, "for an establishment to be functionally distinct, it is not necessary that it be physically separate." *See id.* at 1116.

The court further opined that it would be improper to conflate the operations of the defendant with the premises on which the operations occur, because "[t]here is nothing to indicate any such intention on the part of Congress." *See id.* The court therefore concluded—contrary to

---

[15] Although *Wirtz* did not so note, in *A.H. Phillips,* the Court made clear that the word 'establishment' needed to be interpreted "as it is normally used in business and in government," albeit only because the Court "believe[d] that "*Congress* used the word 'establishment'" in this manner. 324 U.S. at 496 (emphasis added). As explained by the Court in *A.H. Phillips*, "establishment" as used in this particular manner meant "physical place of business," and, "as applied to "chain store systems, 'establishment' thus described each unit in the chain." *See A.H. Phillips*, 324 U.S. 490 at 496 n. 6. Because *A.H. Phillips* did not appear to consider the intended meaning of Congress beyond the chain-store context—a context pointedly different from that before the Court here—the Court concludes that *A.H. Phillips* does not support the notion that Congress intended the construction of "establishment" set forth *in A.H. Phillips* to apply to facts like those involved in the present case.

the position of the plaintiff, the Secretary of Labor—that "defendant's food service is an 'establishment'" for purposes of the exemption under Section 13(a)(20). *See id.*

*Wirtz*, which the Court finds persuasive with respect to its observations noted above, is helpful in guiding the Court's analysis. Though different from § 207(i) in some respects, § 213(a)(20), included the same wording as does § 207(i) limiting the exemption to situations involving an "employee of a retail or service establishment." Just as the defendant's food service operation in *Wirtz* was "functionally distinct" from the physical premises of the cafeteria that defendant leased from Shorter College, *Wirtz*, 303 F. Supp. at 1116, MHS's business at the Gaylord is "functionally distinct" from the physical premises of the Gaylord on which MHS provides its hotel management services for Ryman. Although MHS likely is a company more complex than the defendant in *Wirtz*, the crux of the court's reasoning is nevertheless applicable. The court reasonably found that defendant's *food service operations* (as opposed to the locations where the operations were conducted) was the "establishment" under the FLSA and specifically rejected the contention that the physical premises on which that operations were run affected the analysis.[16] And notably, in reaching that conclusion, *Wirtz* relied on *A.H. Phillips*—namely, the part directing a focus on *functional* distinctiveness, rather than the part directing also a focus on physical distinctiveness. It follows from *Wirtz*, which the Court finds with *A.H. Phillips*, that the appropriate establishment here is MHS's business at the Gaylord, rather than the physical location (premises) on which such business is conducted, *i.e.*, the Gaylord.

---

[16] Defendants cite *Wirtz* in support of their argument that the Plaintiff was an employee of the Gaylord for purposes of the § 7(i) retail-or-service exemption (as well as, of course, being an employee of MHS for other purposes). (Doc. No. 222 at 12). As discussed, however, the *Wirtz* court found that the relevant establishment was the defendant's food service operation, not the physical premises on which it was carried out. Therefore, when the court found that the plaintiff was an employee of a "retail or service establishment," it meant that the plaintiff was an employee of the defendant and nothing more.

Importantly, *Wirtz* is not an outlier. Several courts analyzing other provisions of the FLSA have rejected the idea that for something to be an "establishment," it must be a single physical location. *See Brennan v. Goose Creek Consol. Ind. School Dist.*, 519 F.2d 53 (5th Cir. 1975) (holding that janitors working for a single school district but assigned to various elementary schools were employed by a single "establishment," namely the school district); *Schultz v. Hasam Realty Corp.*, 316 F. Supp. 1136, 1143 (S.D. Fla. 1970) (holding that hotel owning and operating five distinct facilities was a single "establishment" under the FLSA because each facility was "part and parcel of the whole"); *Mitchell v. Gammill*, 245 F.2d 207, 211 (5th Cir. 1957) ("One of the indicia of an 'establishment' is a distinct physical place of business…. Another is a functional unity."); *Acme Car & Truck Rentals, Inc v. Hooper*, 331 F.2d 442, 444–445 (5th Cir. 1964) ("[O]ne major criteria is a distinct physical place of business . . . . Another is whether there is functional unity."). Therefore, in finding that MHS's business at the Gaylord—rather than the Gaylord itself—is the relevant "establishment," the Court does not tread an entirely new path.

The authority cited by Defendants is ultimately unpersuasive in its reliance on the definition of "establishment" contained in DOL regulations. For example, in *Valladares v. Insomniac, Inc.*, the plaintiff volunteered at the defendant's music festival, NW2013, which was held at San Manuel Amphitheater in California. 2015 WL 12656267, at *4 (C.D. Cal. Jan. 29, 2015). The defendant, Insomniac Inc., argued that NW2013 was the "establishment" for the purposes of the amusement-and-recreation exemption to the overtime-payment requirements, whereas plaintiff contended that Insomniac Inc. was the relevant establishment. *See id.* at *7 (citing 29 U.S.C. § 213(a)(3)). The court found that "establishment" as used in the amusement-and-recreation exemption meant "distinct physical place of business" as compared to an "enterprise,"

meaning one integrated unit. *See id.* at *7–*8. Because NW2013 took place at a discrete location, the court found the festival to be the "establishment." *See id.* at *8.

The court in *Chen v. Major League Baseball Properties Inc.*, 798 F.3d 72 (2d Cir. 2015), provided almost identical reasoning. Similar to the plaintiff in *Valladares*, the plaintiff in *Chen* volunteered at FanFest, an event hosted by Defendant ("MLB") at the Javits Center in New York. *See id.* The plaintiff claimed that MLB was the "establishment" in question, whereas MLB argued that FanFest was its own "establishment" for the purposes of the amusement-and-recreation exemption. *See id.* at 75–76. The Second Circuit found that "establishment" as used in § 213(a)(3) meant "distinct physical place of business," and that because FanFest took place at the Javits Center, rather than the MLB headquarters, FanFest was the establishment in question. *See id.* at 82.

Although the courts in *Valladares* and *Chen* each found that "establishment" meant "distinct physical place of business," this conclusion does not square with the courts' findings that the "establishment" was NW2013 or FanFest, respectively; these were *events*, not physical places. The only *physical places* in these fact patterns that could have constituted an "establishment" would have been the Amphitheater where NW2013 was held and the Javits Center where FanFest was held. These venues, however, would not be appropriate subjects of the § 213(a) analysis— they are nothing more than the physical premises upon which the events were held. Given the confounding approach the courts in *Valladares* and *Chen*, and that they were dealing with an entirely different statutory provision,[17] their respective conclusions that "establishment" always

---

[17] The amusement-and-recreation exemption to the overtime-payment requirements states in pertinent part that: "any employee *employed by an establishment which is an amusement* or recreational establishment, organized camp, or religious or non-profit educational conference center . . . ." 29 U.S.C. § 213(a)(3) (emphasis added).

means "distinct physical place of business" is not persuasive to the Court in determining the meaning of "establishment" for purposes of the § 7(i) retail-or-service exemption.

**B.  Whats it Means to be an "Employee Of"**

The entire discussion above assumes, consistent with the parties' mutual approach, that the identification of the applicable "establishment" involves a holistic inquiry into what, under all relevant circumstances, is most sensibly treated as the establishment for purposes of the three-part test to determine whether Plaintiff is subject to the § 7(i) retail-or-service exemption. But the Court acknowledges that conceivably the determination of whether Plaintiff is subject to that exemption could proceed an entirely different manner, beginning with an entirely different approach to identifying the applicable "establishment." Indeed, in addition to contending that the Gaylord is the proper establishment because it is a distinct physical place of business, Defendants argue that the Gaylord is the proper establishment because Plaintiff is an "employee of" the Gaylord. (Doc. No. 222 at 8 ("Defendants need to show that Plaintiffs are employees *of* a retail or service establishment.")).

As illustrated by Defendants' position, the question of what is the proper "establishment" under § 7(i) could in theory instead be approached by (first) answering the question, what is Plaintiff an "employee of"?   In other words, if § 7(i) requires the exempt employee be an "employee of" the "retail or service establishment," whatever entity the exempt employee is an "employee of" must necessarily be the relevant "establishment" for the purposes of the Court's analysis under § 7(i)—thus leaving only the question of whether the identified "establishment" meets the criteria for the § 7(i) retail-or-service exemption. Indeed, the wording of § 7(i) leads to an inevitable chicken-or-egg situation, leaving the Court with more than one avenue by which to determine the proper "establishment" for analysis under § 7(i). For completeness and given that

this is a question of first impression in this circuit, the Court will undertake this alternative analytical approach, even though it is content that it has properly identified the proper establishment through its analytical approach above. Thus, accepting Defendants' invitation, the Court will identify the applicable "establishment" via the alternative approach of identifying what it is that Plaintiff is an "employee of," and deeming whatever that is to be the applicable "establishment."[18]

Having just used "egg" in one metaphor, the Court will use it in another, by noting that that the Court must call an egg an egg: Section 7(i) is a disaster in terms of its terminology, an unfortunate circumstance that very predictably has fostered extraordinary confusion. The labyrinth of statutory interpretation—and the chicken-and-egg problem—reflected herein is unquestionably the unavoidable result of disastrous word choice(s) in Section 7(i). The clearly more sensible phrasing of the provision would have been "an employee *at a* retail or service establishment." This phrasing caters much more to the reader's natural understanding of how the provision should be phrased. Indeed, as if to confirm the appropriateness of such phrasing, Lexis Nexis actually used it (both in its bound volume and its online version of the U.S. Code), incorrectly using the words "by employing any employee *at* a retail or service establishment," rather than the actual words, *i.e.*, "by employing any employee *of* a retail or service establishment." 29 U.S.C. § 207(i) (emphasis added). This rather striking error by such a well-established publisher of the U.S. Code is not explainable, as far as the Court can tell, by any confusion engendered by a change in the statutory language at some point or by legislative history. The likely explanation is that the publisher's responsible employees (surely subconsciously) correctly gathered that the statute

---

[18] The Court notes that, for reasons that do not warrant discussion, it maintains that the approach taken above is the superior of the two discussed possible analytical avenues. In any event, in this case the outcome is the same under each approach.

would have made a lot more sense had it used phrase "at a" rather than "of a," and simply substituted the more sensible phrase for the actual phrase (surely without realizing the error).

In taking the second of the above-referenced two alternative approaches to determining what the applicable "establishment" is under § 7(i), Defendants seek to convince the Court that the Gaylord is the proper establishment on the grounds that Plaintiff is an "employee of" the Gaylord. But like their argument under the first approach, Defendants' argument under the second approach falls flat.

As noted, Defendants argue that the Gaylord is the applicable "establishment" because Plaintiff is an "employee of" the Gaylord. This argument, however, requires the Court to accept that (for purposes of § 7(i)) an individual is an "employee of" a place merely because the individual does the work that is done at that place. This conclusion, however, poses a serious textual problem. Even accepting that "employee" means an individual who does the work of that place, application of that definition to a scenario where the "employer" and "establishment" are not part of the same multiunit entity is unsupported by the regulations and leads to an absurd result. Further, to the extent legislative history should be considered, it demonstrates that Congress did not intend "employee of" to mean merely that the individual does the work of that establishment, *i.e.,* that any individual who does the work of that establishment necessarily qualifies as an "employee of" that establishment. Thus, as discussed below, the textual problems raised by Defendants' position therefore prevent the Court from finding that Plaintiff was an "employee of" the Gaylord.

      i.   <u>Plain Text</u>

The plain text of § 207(i) precludes the "establishment" from being the Gaylord because Plaintiff unambiguously is not an "employee of" the Gaylord within the meaning of § 207(i). For its exemption to apply to an individual (such as Plaintiff), Section 207(i) requires both that the

"employer" employ the individual[19] and that the individual be an "employee of" the "retail or service establishment." 29 U.S.C. § 207(i). Defendants do not dispute that MHS was Plaintiff's "employer," stating that "MHS hired, disciplined, supervised, and fired Plaintiffs; it controlled when they worked and how much they were paid; it maintained employment records and otherwise controlled all aspects of their employment." (Doc. No. 221 at 4). Defendants, however, ask the Court to accept that Plaintiff was an "employee of" the Gaylord because he "perform[ed] the work of the establishment."

In § 7(i), and in particular in its relevant portion, there are three different permutations of the word having the root "employ." Namely, the very first part of § 7(i) contains the words "employer," "employing," and "employee [of]," one time apiece. At least in the abstract, it is possible that for purposes of § 7(i), the person the "employer" is "employing" could be an "employee" of someone (or something) other than the "employer" (whom the person is also an "employee of"); in other words, it is conceivable that the person be an "employee" not only of the referenced "employer," but also of someone or something else. For this reason, Defendants' claim that it is the "employer" of Plaintiff conceivably could be reconciled with the notion that the Plaintiff is the "employee of" something else (the Gaylord in particular, according to Defendant) for purposes of § 7(i). But Defendants' requested application of the § 7(i) retail-or-service exemption—that MHS is the "employer" of Plaintiff, but that Plaintiff is the "employee of" the Gaylord—strikes the Court as counterintuitive and thus implausible from the outset. And the premise underlying Defendant's argument—that for purposes of the exemption, the plaintiff can be the "employee of" someone or something other than the employer—could lead to absurd results.

---

[19] When an employer employs an individual, it is typically said that the individual is an employee of the employer. But the precise language of Section 207(i)—to which the Court does need to pay heed—nowhere expressly refers to the individual as being an employee of the employer; instead, it refers only to the individual being an employee of the retail or service establishment.

Specifically, it would permit a scenario where an "employer" could claim the exemption on behalf of an "employee" employed to do obviously non-retail work, on the sole basis that the employee does retail work for an entirely unrelated second employer.[20]

For example, assume that Smith works on the factory line of a widget wholesaler Monday through Friday and works (for an entirely unrelated retail clothing store or, to be more precise, for the owner of the clothing store) as a salesperson on the weekends. Assume also that the widget wholesaler compensates Smith in a manner that satisfies the third (and final) requirement for the § 7(i) retail-or-service exemption. Under § 207(i), the widget wholesaler would be Smith's "employer," and it would be "employing" an "employee of a retail or service establishment" because Smith is also an employee of the clothing store. Under this construction, a wholesaler, despite obviously not meeting the definition of a "retail or service establishment," would be able to claim the § 7(i) retail-or-service exemption with respect to Smith. Of course, this interpretation would offend the well-established cannon that "absurd results are to be avoided," particularly those that "we are confident Congress did not intend." *United States v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018).

---

[20] Some courts have gone so far as to assume that that "employer" is necessarily the *same* as the "retail or service establishment" under § 207(i). *See Arnold v. DirectTV, LLC*, 2017 WL 1196428 (E.D. Mo. March 31, 2017) (emphasis added); *Diggs v. Ovation Credit Services, Inc.*, 449 F. Supp. 3d 1280 (M.D. Fla. 2020) ("[T]o establish entitlement to the commissioned work exemption, *the employer must show that: (1) it is a retail or service establishment*") (emphasis added); *Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423, 434 (N.D.N.Y. 2014) (explaining that under § 207(i), courts must determine "whether an employer *is* a retail or service establishment.") (emphasis added). Notably, these courts were not called to decide whether the "employer" and the "retail or service establishment" are the same under § 207(i) for the purposes of identifying the relevant entities under the statute. Presumably, therefore, the courts merely assumed the two were the same because it is the natural reading of the statute. While this Court does not necessarily agree that the "employer" and the "retail or service establishment" must be entirely identical (*i.e.*, overlap completely), these examples illustrate that the seemingly natural reading of the statute—that the "employer" *is* the "retail or service establishment"—stands in stark contrast to Defendants' proposed application.

Notwithstanding the challenges posed by the plain text of the statute, Defendants nonetheless insist that the DOL regulations support their position. As pointed out by Defendants, § 779.308 of the DOL regulations states that an employee "meet[s] the requirement of actual employment 'by' the establishment," "whether performing his duties inside or outside the establishment," when he is "employed by his employer in the work of the exempt establishment itself in activities within the scope of its exempt business."[21] 29 C.F.R. § 779.308 (internal quotation marks omitted). According to Defendants, this provision of the DOL regulations supports Defendants' contention that Plaintiff was an "employee of" the Gaylord because he was "employed by his employer in the work" of the Gaylord. But Defendants stretch this provision too far; § 779.308 does not even address the crucial language of § 7(i) requiring Plaintiff be an "employee *of*" of the establishment. 29 U.S.C. 207(i) (emphasis added). Even if the Court were to look past this discrepancy and find § 779.308 pertinent to the interpretation of § 7(i), the pertinence would be minimal because § 779.308 appears to do nothing more than clarify which employees are subject to the § 7(i) retail-or-service exemption *when a single employer maintains both non-retail and retail businesses*. Indeed, the regulation itself cites to several cases, all of which involve multiunit corporate entities consisting of both non-retail and retail units.[22] In short, 29 C.F.R.

---

[21] This regulation uses the term "exempt establishment." This terminology is inexact, because the § 7(i) retail-or-service exemption is employee-specific, not establishment-specific. That is, an employee (or, more precisely, an employee's compensation) either is or is not subject, entirely, to the § 7(i) retail-or-service exemption. The same is not true of establishments; even establishments having some employees that are subject to the § 7(i) retail-or-service exemption could have employees who fall outside that exemption because of their compensation structure. So "exempt establishment" here really means "establishment having one or more exempt employees." To the extent that § 779.308 refers to the former Section 13(a)(2), the same reasoning applies. *See A.H. Phillips, Inc.*, 324 U.S. at 491 (explaining that the issue in the case is whether the *employees* are exempt from the FLSA's wage-and-hour provisions).

[22] In fairness to the DOL, in that scenario, the definition promulgated by the regulations makes sense. When a company owns and operates both non-retail and retail businesses, an exemption for employees connected to retail or service activities ought to apply only to those employees working within the scope of the retail (or service) business. *See A.H. Phillips*, 324 U.S. 490 (1945) (holding that employees working in the

§ 779.308 itself suggests that its definition of an "employment by" a retail or service establishment—namely, someone "employed by his employer in the work of the exempt establishment itself in activities within the scope of its exempt business"—was not intended to apply beyond multiunit entities having both non-retail and retail businesses, and, in the Court's view, stretching it to apply to this case opens the doors to a construction plainly at odds with the text of § 207(i). And it is axiomatic that definitions contained in agency regulations cannot change the plain meaning of the statutory text.

ii.   Legislative History

Although the Court could end its interpretation of "employee of" with the plain text of the statute, in the event ambiguity does in fact exist as to whether Plaintiff could be an "employee of" the Gaylord, the legislative history suggests that such question should be answered in the negative. The legislative history illustrates that Congress knew how to write a provision of the FLSA to apply to an individual merely performing the work of an establishment but chose not to do so when drafting § 207(i).  When passed, the FLSA contained Section 13(a)(2), which exempted employees from the overtime-payment requirements who worked in a "local retailing capacity." *See Kelly*, 2010 WL 1541585 at *6 (citing H.R. Rep. No 75–2738, at 9). In doing so, Congress sought to exclude business that was "of a purely local nature" and that did not "substantially influence the stream of interstate commerce." S. Rep. No. 75–884, 5 (1937); *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943).

In its initial state, Section 13(a)(2) applied to "any employee *engaged in* any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." H.R. Rep. No. 75–2738, at 9 (emphasis added). In 1949, Congress amended Section 13(a)(2),

---

grocery stores were subject to the Section 13(a)(2) exemption, but those working in the warehouse of the same company were not).

changing the language to "any employee *employed by* any retail or service establishment…" H.R. Rep. No. 81–1453, 8 (1949) (Conf. Rep.). In 1961, Congress again amended the FLSA to include § 207(i). The additional provision was motivated in part by retail employers' concern that providing overtime payments to employees working on commission could put an undue strain on the employers. *See Kelly*, 2010 WL 1541585 at *8. In 1989, Congress repealed Section 13(a)(2) in its entirety but left § 207(i) intact. H.R. Rep. No. 101–260, 18, 39 (1989) *as reprinted in* 1989 U.S.C.C.A.N. 696, 706, 727.

Although Section 13(a)(2) and § 207(i) were always distinct provisions of the FLSA, they were closely related. On their faces, both excluded a particular segment of employees (those working in retail or services), from the overtime-payment requirements of the FLSA. In practice, to aid in their interpretations of § 207(i), courts regularly draw on DOL regulations citing to Section 13(a)(2). *See Kelly*, at *11 ("The courts have also uniformly concluded that, despite the 1989 repeal of the exemption in Section 13(a)(2) for certain retail or service establishments, the definition of a retail or service establishment that was contained in that section still applies to the phrase as used in section 7(i).").[23]

The evolution of Section 13(a)(2) is not without significance. "The reenactment canon provides that whenever Congress amends a statutory provision, a significant change in language is presumed to entail a change in meaning." *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (internal quotation marks omitted). Therefore, the Court must assume that Congress intended to effectuate a change in the law when, in 1949, it changed Section 13(a)(2) from applying to employees "engaged in any retail or service establishment" to applying to employees "employed by" such an establishment. The natural conclusion drawn from the amendment is that Congress sought either

---

[23] Although not entirely correct, Defendants even refer to Section 13(a)(2) as the "former retail or service exemption." (Doc. 209-1 at 10).

to narrow or to clarify the relationship between the employee and the retail or service establishment necessary to bring an employee under an exemption for employees having some relationship with a retail or service establishment. And when (in 1961) Congress enacted § 207(i)—a provision sharing similar language and a similar purpose with § 13(a)(2)—it is noteworthy that Congress did not choose to cover simply "employees engaged" in a retail or service establishment. Consistent with its changes to Section 13(a)(2), Congress sought to limit the § 7(i) retail-or-service exemption to "employees of a retail or service establishment." The legislative history therefore suggests that Congress knew how to write exemptions (to otherwise applicable FLSA requirements) to apply to employees performing the work of a particular place irrespective of whether they are employed by the owner (or lessor) of that place, and yet it chose not to do so in drafting § 207(i). The legislative history regarding exemptions for employees connected with retail and service establishments, therefore, does not support Defendants' interpretation that Plaintiff is an "employee" of both the Gaylord and MHS.

In summary, even if the plain text were ambiguous as to whether Plaintiff was an employee of the Gaylord, the legislative history suggests that "employee of" means something more than simply doing the work that is done at that place.[24]

---

[24] The Court confesses that this conclusion with respect to the statute is not completely satisfying. As noted above, the statutory construction would have been much simpler (and satisfying) had the statute instead said that "no employer shall" have violated the overtime-payment requirements by "employing any employee" "*at a* retail or service establishment" (or perhaps that "no employer shall" have violated the overtime-payment requirements by "employing any employee of" *its* "retail or service establishment"). Congress could have so provided, and indeed it did something along those lines in another provision of the FLSA. *See* 29 U.S.C. § 213(a)(3) ("any employee employed by an establishment *which is an* amusement or recreational establishment") (emphasis added)). But even if Congress could have been clearer in its drafting of § 207(i), the Court must work with the text of the statute as written.

3. RETAIL OR SERVICE ESTABLISHMENT CRITERIA

It is one thing to identify, as the Court has done above, the relevant "establishment," *i.e.,* the "establishment" that Plaintiff is an "employee of." It is another thing to say that the establishment is a "retail or service establishment," as required for the § 7(i) retail-or-service exemption. The question here is whether the relevant "establishment"—MHS's business at the Gaylord—is a "retail or service establishment" in particular.

DOL regulations state that a "retail or service establishment," as also previously defined in Section 13(a)(2), means an "establishment 75 per centum of whose annual dollar volume sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry. 29 C.F.R. § 779.24.[25] The regulations further note that the requirement that "75 percent of the establishment's annual dollar volume must be derived from sales of goods or services (or both) which are recognized as retail sales or services in the particular industry" is distinct from the requirement stating that 75 per cent of the establishment's sales of goods or services be not for resale. *See* 29 C.F.R. § 779.322.[26] (Below, the Court will refer to these two requirements as the "two 75-percent requirements"). In other words, the establishment must show both that 75 percent of its annual dollar volume sales of goods or services is not for resale and 75

---

[25] While not made clear in 29 C.F.R. § 779.24, both "goods" sold and "services" sold must be retail in nature to count towards the 75-percent requirement. *See* 29 C.F.R. § 779.322 ("75 percent of the establishment's annual dollar volume must be derived from sales of goods or services (or of both) *which are recognized as retail sales or services* in the particular industry…") (emphasis added). Thus, the more accurate, albeit more cumbersome, term for "retail or service establishment" is "retail-goods or retail-services establishment."

[26] These regulations are interpretive rules and "were not subject to notice-and-comment rulemaking," and therefore are only subject to deference insofar as they "have the power to persuade." *See Diggs*, 449 F. Supp. at 1287 n.8 (internal quotation marks omitted). Unlike several other DOL regulations discussed herein, the Court finds nothing about these regulations inconsistent with the text of the FLSA. The Court therefore finds it appropriate to rely on the regulations for guidance in determining what constitutes as "retail or service establishment" within § 207(i).

percent of its annual dollar volume sales of goods or services are recognized as retail sales or services in the particular industry. While the regulations provide guidance on what businesses are retail in nature, they provide no exacting definition or exhaustive list of such businesses, and therefore the Court must make a case-specific determination.

A. **Identifying The Goods or Services Subject to the 75-percent Requirements**

To determine whether the relevant establishment (MHS's business at the Gaylord) is a "*retail or service* establishment,"[27] the Court first identifies the goods and/or services, the sales of which are to be subjected to the two 75-percent requirements. While Plaintiff agrees with Defendants that the focal point for this question are services provided by MHS, Plaintiff asserts that the relevant services at issue are those given by MHS *to Ryman*. (Doc. No. 217 at 8). Defendants, by contrast, assert that the goods and services rendered by MHS to customers at the Gaylord fulfill the 75-percent requirements. (Doc. No. 209-1 at 11–12).

In support of his position, Plaintiff notes that "Marriott generates income at the Gaylord through management fees and not retail fees . . . ." (Doc. No. 217 at 10). Therefore, Plaintiff urges that Court to focus not on MHS's transactions with customers at the Gaylord for rooms, events, and food and beverage, but rather on the "hotel management services that Marriott provides Ryman." (Doc. No. 217 at 8).

Where a company provides services to the general public made possible through an agreement with a third-party for the use of the premises on which to provide the services, courts have treated the company's provision of the services with the general public—rather than the agreement between the company and the third party to provide the services—as the services at

---

[27] The Court's two-step approach (*i.e.*, first determining what the relevant "establishment" is, and then determining whether such establishment is a retail or service establishment) is reflected in the subject-matter and adjacent placement of 29 C.F.R. § 779.23 (entitled, "Establishment") and 29 C.F.R. § 779.23 (entitled, "Retail or service establishment").

issue for analysis under the two 75-percent requirements. *See Wirtz*, 303 F. Supp. at 1117; *Hodgson v. Prophet Co.*, 472 F. 2d 196 (10th Cir. 1973) (company supplying food services at a college was a "retail or service establishment" under Section 213(a)(2) of the FLSA despite receiving payment from the college rather than directly from the students). In other words, for purposes of the two 75-percent requirements, courts focus on what the company supplies directly to the consumer rather than what the company supplies to the third-party providing the premises.

In *Wirtz*, Campus Chefs Inc. contracted with Shorter College to supply cafeteria services to the college's students. *See Wirtz*, 303 F. Supp. at 1115. Shorter College received payment directly from students and used these funds to pay Campus Chefs Inc. under the contract. *See id.* The court, apparently prompted by an argument made by the government at trial, squarely addressed whether Campus Chefs' services provided to Shorter College *students* rather than to the college itself were the appropriate services to be subject to Section 13(a)(2)'s requirement that 75% of the establishment's sales be retail in nature. *See id.* at 1118. The court explained the agreement between Campus Chefs and Shorter College, whereby Shorter paid Campus Chefs by remitting part of the payments received from students, had "no legal significance" to whether the services supplied by Campus Chefs were retail in nature. *See id.* at 1118–1119. In addressing whether the nature of the payment changed the character of the services, the court explained:

> The court likewise concludes that there is no legal significance in the mode of payment. At trial, the government conceded that its position would be considerably weakened if the food payment was made directly to the defendant rather than to the college at registration. Such a narrow technical view is untenable in the practical application of the act to everyday business operations. A considerable number of retail sales are made daily where the payment goes to a third party such as American Express, Diner's Club, bank credit plans, private and civic clubs, lease arrangements, salary checkoffs, and the like wherein the seller looks solely to the third party for payment. *The retail characteristics of the transaction are not destroyed by such payments nor are such purchases considered for resale merely because the consideration passes through an indirect conduit either before or after the actual transfer.* For example, can it be seriously argued that the pre-payment of

quarterly civic club dues, including meals, converts the serving of the meal by the hotel or restaurant to the member-consumer into a non-retail transaction? The court thinks not.

*Id.* (emphasis added).

Plaintiff's argument is emblematic of the "narrow technical view" rejected by the court in *Wirtz*. Contrary to Plaintiff's argument, MHS's operation of the Gaylord on behalf of Ryman, or as Plaintiff puts it, MHS's hotel management services, cannot be separated from the services that MHS provides customers at the Gaylord; they are one in the same. The offering of hotel rooms, contracting for events, and providing of food and beverages are the exact type of services that Ryman has entrusted MHS to facilitate at the Gaylord. Further, MHS's base management fee is nothing more than a method by which to measure MHS's share of the revenue generated from the direct sales made by MHS at the Gaylord to the customers. Indeed, it is undisputed that MHS directly collects the payments from customers at the Gaylord, places this revenue in a Marriott Business Services bank account, retains the base management fee (and incentive management fee if applicable), and remits the remainder of the profit to Ryman. (Doc. No. 221 at 3; Doc. No. 222 at 5; Doc. No. 217 at 7 ("Marriott retains any base and incentive management fees owed, and forward Ryman any profits above that amount.")). Regarding banquet events in particular, MHS enters into contracts with the customers, not the Gaylord or Ryman. (Doc. No. 222 at 5). Therefore, unlike in *Wirtz*, in which the Shorter College was the intermediary between Campus Chefs and the students for payment, MHS receives payment directly from the customers at the Gaylord and passes the money to Ryman through the Marriott Business Services bank account. MHS therefore has even more direct contact with the retail consumer than Campus Chefs did in *Wirtz*, a circumstance indicating even more strongly that MHS's services at the Gaylord are retail in nature despite MHS's contractual arrangement with Ryman.

Ultimately, Plaintiff's argument that MHS's hotel management services provided to *Ryman* (rather than the customers to whom MHS directly provides services) are the proper focus of the Court's § 207(i) analysis improperly elevates form above substance. As explained, the services MHS provides to Ryman cannot be separated from those it provides to customers at the Gaylord, and the type of compensation MHS receives for those services does nothing to change this. The Court therefore will treat MHS's services rendered and goods sold to customers at the Gaylord as the relevant goods and services for determining whether MHS's business at the Gaylord (the relevant establishment, as noted above) is a "retail or service establishment" for purposes of § 207(i).

### B. The First 75-percent Requirement: Goods Or Services Not For Resale

Plaintiff does not dispute that the goods and services MHS provides at the Gaylord are not for resale. (Doc. No. 221 at 8–9). A good or service is sold for resale "where the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, as a part, component or ingredient or another article." 29 C.F.R. § 779.331 (providing DOL's "[m]eaning of sales 'for resale'"); *Charlot v. Ecolab, Inc.*, 136 F. Supp. 3d 433 (E.D.N.Y. 2015) (explaining that the "FLSA does not define the term 'resale,' but the DOL regulations and others courts apply the 'common meaning' which is the 'act of selling again'" (citing 29. C.F.R. § 779.331)). Defendants assert that since 2015, "sales of Hotel goods and services that were not for resale comprised well more than 95% of total room sales and more than 98% of total annual sales." (Doc. No. 209-1 at 12, Doc. No. 221 at 8). Because the parties do not dispute Defendants' satisfaction of this requirement, the Court finds it unnecessary to provide an exhaustive analysis. The Court is satisfied that over 75% of the services MHS provides at the

Gaylord, such as room rental, event hosting, and food and beverage services and sales are not for resale within the meaning of the FLSA.

**C.  The Second 75-percent Requirement: Recognized As Retail Sales In The Industry**

"The Supreme Court has held that the question of whether a defendant's business is recognized as retail is determined by the court, not by the defendant or the defendant's industry."[28] *See Johnson v. Wave Comm. GR LLC*, 4 F. Supp. 3d 423, 436–437 (N.D.N.Y. 2014). Courts have formed a two-pronged test for answering this question, consistent with the DOL regulations; specifically, for the defendant's business to be recognized as retail, 1) "the establishment must be part of an industry in which there is a retail concept", and 2) the "establishment's services must be recognized as retail in that particular industry." *See id.* 437.

   i.   Retail Concept

"A business must have a retail concept before the industry characterization of its sales can be considered." *See id.* 436–437. A "retail concept" cannot be "artificially created in an industry in which there is no traditional concept of retail selling or servicing." *See id.* (citing 29 C.F.R. § 779.316). The DOL regulations provide that:

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process… It provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living. Illustrative of such establishments are: Grocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops, and other such local establishments.

---

[28] As set forth immediately below this text, the industry view of the defendant's business is highly relevant to the Court's determination, but nevertheless, the ultimate determination is made by the Court, not by the defendant's industry.

29 C.F.R. § 779.318(a). MHS's business at the Gaylord closely matches the general characteristics of businesses with a retail concept: MHS makes sales of goods and services to the public through transacting with the patrons of the hotel, whether it be for rooms, events, or food and beverages; the services provided by MHS at the Gaylord are provided directly to the customers of the Gaylord and therefore are "at the very end of the stream of distribution"; MHS's services are also for the "comfort and convenience" of the public by providing rooms and eateries.[29] (Doc. No. 209-1 at 13–14). Courts have also repeatedly recognized hotels as a quintessential example of a "retail or service establishment" insofar as the industry possesses a retail concept. *See e.g.*, *Diggs v. Ovation Credit Services, Inc.*, 449 F. Supp. 3d 1280, 1288 (M.D. Fla. 2020) (discussing hotels as an example of a "local retail or service establishment"); *Umbrino v. L.A.R.E. Partners Network, Inc.*, 2022 WL 452702 (W.D.N.Y. Feb. 15, 2022) (same). Therefore, the Court accepts that MHS's business at the Gaylord, which primarily consists of sales (or nightly rentals) of hotel rooms, event space, and food and beverage services and sales directly to customers, possesses a "retail concept."

ii. <u>Recognized As Retail</u>

Under the two-prong test adopted by the Court for determining whether the defendant's business is recognized as retail, MHS's services at the Gaylord must also be recognized as retail *in the industry*. *See Johnson*, 4. Supp. 3d at 437. The DOL regulations explain that "it was emphasized in the debates in Congress that while the views of an industry are significant and material in determining what is recognized as a retail sale in a particular industry, the determination is not dependent on those views alone." 29 C.F.R. § 779.324. "Such a determination must take into consideration the well-settled habits of business, traditional understanding and common knowledge." *See id.* At least one circuit has noted that the requirement that the sales be recognized

---

[29] Plaintiff himself agrees that "the sale of hotels rooms, food and drink, and banquet services" are "traditional retail sources." (Doc. No. 217 at 8).

as retail in the particular industry "is not synonymous with 'recognized by the industry.' Obviously what is recognized in a particular industry to be retail can be proved objectively; proof is not restricted to the subjective test of what the members of the industry think of it." *See Mitchell v. City Ice Co.*, 273 F. 2d 560 (5th Cir. 1960).

There is a surprising lack of authority on the type and quantity of evidence sufficient to establish that goods or services (or both) are recognized as retail in the given industry. While courts have considered declarations submitted by industry peers of the party, the DOL regulations caution against reliance solely this type of evidence. *See Charlot*, 136 F. Supp. 3d at 469–470 (discussing affidavits of industry peers in considering whether the defendant's sales were recognized as retail in the industry).

Nonetheless, the undisputed facts establish that Defendants' services are recognized as retail in the industry. It is undisputed that MHS's business at the Gaylord provides a "popular destination for businesses, associates and other groups that want to host large-scale events." (Doc. No. 221 at 6). The parties further agree that the services are "advertised" and "open" to the "general public" and that the Gaylord is "a member of many retail and tourism-focused industry organizations, including the Greater Nashville Hospitality Association, Nashville Convention and Visitors Corporation, Tennessee Hospitality & Tourism Association, and Hospitality TN." (*Id.* at 7–8).

The Court can rely not only on these undisputed facts, but also on "traditional understanding" and "common knowledge." *See* 29 C.F.R. § 779.324. MHS's services at the Gaylord are those traditionally associated with the operation of a hotel—renting rooms, selling food, providing event spaces—and those familiar with Nashville would surely regard MHS's services at the Gaylord as retail in nature. Therefore, although Defendants do not provide affidavits

or declarations of industry players to attest to the nature of MHS's services at the Gaylord, the Court finds that the facts provided by Defendants, and conceded by Plaintiff, establish that the services and goods are recognized as retail in the industry.

Thus, for the purposes of the § 7(i) retail-or-service exemption, Plaintiff is an employee of a retail or service establishment, *i.e.* MHS's business at the Gaylord.

### 4. MHS'S COMPENSATION METHOD

For the § 7(i) retail-or-service exemption to apply to Plaintiff, it is not sufficient merely that Plaintiff be an employee of a retail or service establishment. Plaintiff's compensation structure must also be of a particular type; thus, the Court must next determine whether the structure of Plaintiff's compensation from MHS as a banquet staff member is of the type that renders applicable the § 7(i) retail-or-service exemption

The exemption is applicable to an employee of a retail or service establishment (like Plaintiff) if "the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title" and "more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). Plaintiff does not dispute that he was paid 1.5 times the minimum hourly rate applicable under Section 206 of the FLSA (commonly known as the "minimum wage"). (Doc. No. 221 at 20). The Court's remaining task, therefore, is to determine whether the distribution of the service charge constitutes a commission under § 207(i). *McAninch v. Monro Muffler Brake, Inc.*, 799 F. Supp. 2d 807, 812–813 (S.D. Ohio 2011) (explaining that the issue of whether more than one-half of a plaintiff's compensation consisted of commission is an issue of law for the court to decide).

The parties agree that MHS's compensation structure consists of two inputs. The first is an hourly wage and the second is a service-charge distribution. (Doc. No. 221 at 13). Importantly, Plaintiff asserts that these two inputs amount to nothing more than an "hourly wage" or a "variable hourly wage," whereas Defendants assert that the latter input represents a "commission." (*Id.* at 13, 16). It is undisputed that the service-charge distributions for banquet staff are calculated weekly. (*Id.*at 13–14). MHS retains 45 per cent of the service charge in the Marriott Business Services bank account, which is earmarked for Ryman, and the remaining 55 per cent is distributed weekly among the banquet staff members. (*Id.* at 13–14). The respective share of the 55 percent that is received by each banquet staff member is based on the number of hours he or she worked that week relative to the total hours worked by all banquet staff that week. (*Id.* at 14).

Because the service charge to a customer is calculated as a percentage of the total cost of the customer's particular event at the Gaylord, and because this cost varies by event, the weekly total amount of service charges varies greatly week-to-week. It follows that the amount of weekly distributions received by banquet staff members also varies week-to-week. For instance, the parties agree that during the workweek ending December 25, 2015, Plaintiff worked 41.2 hours and received a service charge distribution of $500.84. (*Id.* at 17). In the work week ending August 14, 2015, however, Plaintiff worked less than ten percent longer (a total of 44 hours) and yet received almost double the amount in service charge distributions (a total of $1,050.54). (*Id.*). This example undercuts Plaintiff's characterization of the service charge as part of a variable hourly rate; it is clear that the difference in compensation between the two weeks in not a "varia[tion] in hourly rate," which connotes some sort of conscious decision on the part of the employer (and, one would hope, mutually the employee) to change the rate that the employee is paid for each hour for the week in question. Instead, what changed is the total amount of service charges that happened to be

available for distribution given the nature of the events for the week and what service charges they collectively generated. Consistent with several other courts that have considered this issue (albeit under somewhat different facts), the Court agrees with Defendant that the distribution of the service charge represents a commission for purposes of § 207(i), and not a variable (upward) change from a base hourly rate.

Plaintiff asserts that the service-charge distributions are not commissions, because (according to Plaintiff) 1) they lack proportionality to the revenue collected from customers at the Gaylord, 2) they are not "decoupled" from the number of hours worked, and 3) they do not incentivize the banquet staff members to work more efficiently. (Doc. No. 217 at 11). Defendants respond that there is proportionality between revenue collected from the banquets and the service-charge distributions, and that time worked is a permissible input in determining how the service charge distribution is divided between the banquet staff. (Doc. No. 222 at 17–19, Doc. No. 209-1 at 17–19). Defendants also assert the Sixth Circuit has rejected the argument that a commission must function to potentially incentivize increased efficiency. (Doc. No. 209-1 at 20).

"Neither the FLSA nor the United States Department of Labor's ("DOL") implementing regulations provide a definition for the term 'commission' as it is used in the [§ 7(i) retail-or-service] exemption." *See McAninch*, 799 F. Supp. 2d at 812–813. "Indeed, the meaning of 'commission' under the FLSA is an issue that finds little illumination from the sparse case law and the vague references in statutes and regulations." *See id.* (internal quotation marks omitted).[30]

---

[30] While the DOL regulations provide little guidance on what a commission *is*, the regulations do provide examples of what commission is *not*. "A commission rate is not bona fide if the formula for computing the commissions is such that the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee)." 29 C.F.R. § 779.416(c). Further, a commission is not bona fide if the payment received by the employee "constitute[es] nearly his entire earnings which is expressed in terms of a percentage of the sales which the establishment or department can always be

Nevertheless, in determining whether Plaintiff's share of the (55 percent) service charge constitutes a commission, the Court does not write on a blank slate.

In the only Sixth Circuit case to address the meaning of "commission" under § 207(i), the Sixth Circuit agreed with the lower court that to constitute a "commission" under § 207(i), the employer "must establish some proportionality between the compensation to the employees and the amount charged to the customer." *See Wilks v. Pep Boys*, 2006 WL 2821700 (M.D. Tenn. Sept. 26, 2006), *aff'd Wilks v. Pep Boys*, 278 Fed. App'x 488 (6th Cir. 2008). Importantly, *Wilks* does not stand for the proposition that such proportionality *alone* establishes a payment as a commission. Instead, *Wilks* mandates that any payment seeking to be a commission must be somewhat proportionate to the amount charged to the customer. Because proportionality is *sine qua non* in finding a payment is a commission, the Court addresses it first.

i.  Proportional

Although the court in *Wilks* did not expound on the meaning of "proportionality," its discussion and application are consistent with the ordinary meaning of the word, which is "increasing or decreasing in size, amount or degree according to changes in something else." *See* Oxford Dictionary, "Proportionate" (https://www.oxfordlearnersdictionaries.com/us/definition/english/proportionate) (last visited January 6, 2023).

*Wilks* involved an automotive parts and repairs store's payment of its employees. *See Wilks*, 2006 WL 2821700 at *1. The defendant argued that its "flat-rate" employees were exempted from

---

expected to make with only a slight addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota." *Id.* Plaintiff does not (and could not credibly) argue that either of these examples reflects his compensation structure. Those interested can review *McAninch.*, 799 F. Supp. 2d 807, for further discussion of the examples provided in the regulations.

overtime payments under § 207(i) in part because their compensation included a commission. *See id.* at *16. The "flat-rate" employees were credited with a certain number of labor hours, which were then multiplied by a "flat-rate" ranging from $14 to $23.70. *See id.* The court found that the defendant had presented "no evidence that customers are charged more for labor when the work" is completed by a worker with a higher-flat rate. *See id.* at *17. Therefore, the compensation scheme did not include a commission because there was no proportionality between "the plaintiffs' flat-rate wages and the charges passed onto customers, either for labor alone or for the overall task." *See id.* at *18.

Defendants argue that the service-charge distributions are proportional to the price paid by customers for events at the Gaylord because service-charge distributions, which represent a percentage of the overall service charge, fluctuate based on the price and number of events held at the Gaylord that week. (Doc. 209-1 at 19). Defendants' logic is sound; each event customer must pay a 24% or 25% service charge, which is based on the overall price of the event. Fifty-five per cent of the service charge is then distributed to the banquet staff based on the number of hours each staff member worked. Therefore, the service-charge distributions to an employee increase or decrease depending in substantial part on the price and number of events held at the Gaylord in the given week.

Plaintiff takes a starkly contrasting view. According to Plaintiff, his share of the service-charge distribution is "not in any way proportional to the value of the services that he provided in any given week." (Doc. No. 217 at 15). But this observation, even if true, is irrelevant. *Wilks* does not require proportionality between *the number of hours worked by an employee* and the employee's compensation (meaning, in the instant case, Plaintiff's share of the service-charge

distribution). Instead, it requires "some proportionality" between *the amount charged to the customer* and the compensation to the employee.

Plaintiff goes on to hypothesize that he could work a single high-priced banquet event one week and multiple smaller events the following week, and make less from the service-distribution charge in the first week than the second week. (*Id.*). In Plaintiff's view, this scenario illustrates that "Marriott does not tie his pay to the revenue generated from the events that he worked . . . ." (*Id.*). But Plaintiff's hypothetical is consistent with Defendants' explanation of how the (55 percent of the) service charge is distributed, inasmuch as a week with several expensive banquets but in which Plaintiff worked few hours could yield a lower service-charge distribution than a week with several less expensive banquets in which Plaintiff worked many hours. Plaintiff's hypothetical therefore illustrates how the number of hours an employee worked that week affects their portion of the service-charge distribution, but does not prove, as Plaintiff suggests, that the service-charge distribution is disconnected from the price charged to the customer.

Because the service charge distributions fluctuate based on the number and price of events held at the Gaylord in a given week, the Court finds that proportionality exists. Whether the distribution to employees based on hours worked separately affects the payment's status as a commission is a different question and is addressed below.

  ii. <u>Decoupled Form Work Hours</u>

Although *Wilks* does not require that a commission be decoupled from work hours, several courts have found this to be an important characteristic of a commission. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 284 (3rd Cir. 2010); *Yi v. Sterling*, 480 F.3d 505, 509 (7th Cir. 2007). And this distinction makes sense; after all, it seems clear that a commission is widely understood as compensation derived from the revenue earned from a sale or transaction rather than solely based on the number of hours an employee works. *See* Oxford Dictionary, "Commission"

(https://bit.ly/3jItgxL) (last visited January 6, 2023) ("Payment, or a payment, for services or work done as an agent in a commercial transaction, typically a set percentage of the value involved."). Plaintiff contends that the service-charge distribution is not decoupled from his work hours inasmuch as each employee's cut of the entire (55 percent of the) service charge is based in part on the number of hours he or she worked. (Doc. No. 217 at 12). Defendants respond that dividing the service-charge distribution based on hours is merely a method of deciding how the commission is divided between employees and does not affect the payment's characterization as a commission. (Doc. No. 222 at 17–20).

Defendants rely on the court's reasoning in *Yi* to support their position. In *Yi*, the Seventh Circuit confronted the same issue, *i.e.*, whether payment distributed partially based on hours worked are "decoupled from actual time worked." *See id.* at 509. *Yi* involved workers at an auto-repair shop who were compensated using a formula that multiplied the number of booked hours designated for a job (as opposed to the number of hours it took to actually complete the job) by the ratio of a team member's actual hours worked to the total hours worked by the team, and then by the wage, per booked hour, which varied based on skill and experience. *See id.* In determining whether this payment scheme constituted a commission, the Court compared it to the dividing of commissions between real estate brokers based on time expended:

> Now suppose two real estate brokers work on the sale of the same house, and the question arises how they should split their commission. One broker suggests a 50–50 split, but the other ripostes, "I put in two-thirds of the time on this sale, so I should get two-thirds of the commission." Suppose the first broker agrees. Does this mean, because the number of hours they worked figured in their split of the commission, that they weren't paid a commission, but an hourly wage? Surely not. This simple example turns out to resolve the present, complicated-seeming case.

*See id.* at 508–509. Extrapolating this example to the payment structure of the auto-repair shop, the court explained that "the fact that the time they put in is a factor in divvying up the commission

no more alters the commission character of their compensation than in the broker case. If a team is paid a commission, the commission has to be divided between them somehow, and the method chosen for doing this doesn't alter the character of the compensation as a commission." *See id.* 509–510.

The reasoning in *Yi*, which the Court finds to be sound, is directly applicable to MHS's payment structure for Plaintiff. Similar to the plaintiff in *Yi*, Plaintiff's alleged commission is based in part on what is charged to the customer,[31] a portion of which is divided among various employees, and in part based on hours worked, which drives the computation of his share of what is thus divided. True, as Plaintiff points out, the court in *Yi* also commented that "the faster the team works, the more it earns per number of hours,"[32] which is not the case for banquet staff members like Plaintiff. *See id.* at 509. Under MHS's compensation structure, and given the nature of the banquets for which MHS's customers pay, Plaintiff can earn a larger portion of the service-charge distribution only by working more hours (and not by, for example, working faster). Nonetheless, in *Yi,* two workers with the same rate and doing the same job would experience disparate pay due only to the differences in hours they worked; the same is true for banquet staff members in the instant case.[33] To the Court, this renders the reasoning of *Yi* applicable in the present case, even though the payment structure in *Yi* differed in permitting workers to earn more

---

[31] This input (*i.e.*, what is charged to the customers) was booked hours in *Yi,* and is the service-distribution charge in the present case.

[32] This was because compensation was based on the number of booked hours, and a faster team could complete jobs in less time than was "booked," meaning that it could earn credit for more booked hours.

[33] The Court notes that in *Yi*, a worker's portion of the overall commission was based in part on the hourly rate associated with that particular worker, whereas Plaintiff's (or other banquet staff member's) share of the commission for a particular week is unaffected by that staff member's particular rank or hourly wage as compared to his or her colleagues. However, the Court does not view this distinction as legally significant. To the extent that particular categories of workers in *Yi* were entitled to more or less of the commission pool due to their particular hourly rate, the Court views this only as an additional method by which the employer chose to divide up the commission pool.

by working more efficiently. *Yi* thus supports the Court's finding that MHS's dividing the (55 percent of the) service charge based on hours worked does not prevent Plaintiff's service-charge distribution from constituting a commission.

In summary, sometimes an employer wishes to compensate multiple contributing employees by dividing up something that would obviously be a commission had only one employee contributed to its being earned. When this occurs, there must be a method of dividing the pie. One way of so doing is to make the division based on hours worked. Like the Court in *Yi*, the Court finds that an employer's choice of the hours-worked method does not destroy the status of each employee's share as a commission for purposes of § 7(i). And here, MHS's practice of dividing the service-charge distribution based on number of hours worked does not alter its status as a commission.

      iii.   Incentive

Plaintiff maintains that MHS's payment scheme cannot be a commission, because it lacks a mechanism by which to incentivize workers to work more efficiently. (Doc. No. 217 at 16). As Defendants point out, the district court in *Wilks* addressed the same argument that a payment is a commission only if it incentivizes workers to "hustle to finish the job." *See Wilks*, 2006 WL 2821700 at *11. The *Wilks* court rejected this argument and pointed out that the plaintiffs failed to identify any binding authority to support their argument. *See id.* at *16. Similar to the plaintiffs in *Wilks*, Plaintiff cites only cases from other districts involving workers in trades, such as auto-repair mechanics and cable technicians. In those contexts, it may make sense to consider whether the payment structure has an incentive factor. For example, it behooves a cable company to have its technicians work more efficiently because such efficiency increases the number of jobs technicians can complete each day. But the same is not true of banquet services. The maximum length of a given banquet presumably will be set by contract between MHS and the customer, and the actual

length within that maximum will be determined by the customer—the banquet hosts and potentially the guests of the banquet. Accordingly, no matter how efficiently they work, banquet staff members lack the ability to somehow shorten banquets and thereby free up space and banquet staff members to enable MHS to put on more banquets (and thus obtain more gross revenue).

This unique characteristic of *events* as compared to *trade jobs* was touched on by the court in *Mechmet v. Four Seasons Hotel, Ltd*, in which the Seventh Circuit addressed facts strikingly similar to those before the Court. 825 F.2d 1173 (7th Cir. 1987). In *Mechmet*, the Seventh Circuit determined that the Ritz Carlton Hotel compensated its banquet waiters in part via commission as required under § 207(i). *See id.* at 1174–1175. The Ritz added an 18 percent service charge to every banquet and distributed 16 per cent among the banquet staff according to rank. *See id.* at 1175. The court noted that the DOL regulations state that the § 7(i) retail-or-service exemption was enacted to "relieve an employer from the obligation of paying overtime compensation" to employees "generally employed in so-called 'big ticket' departments," such as "bedding and home furnishings, floor covering, draperies, major appliances . . . .". *See id.* at 1176 (quoting 29 C.F.R. § 779.414). The court noted than an important aspect of big-ticket departments is that the employees may be working irregular hours. *See id.* at 1177. With respect to banquets, the court observed:

> Moreover, the length of a banquet cannot easily be gauged in advance, since it depends on how good a time the banqueters are having. It would be impossible in these circumstances to arrange things so that every banquet waiter worked 40 hours every week. In a busy week the Ritz's small staff of regular banquet waiters (there are only 10) may have to work additional hours in order to take care of all the banquets. The staff could be paid time and a half for the extra work, but an alternative—and judging from the figures in the record a more lucrative—approach, from the standpoint of the waiters themselves, is to let them divide up [a portion of] the service charge that the hotel affixes to every banquet charge.

*See id.* As observed in *Mechmet*, it is largely unfeasible for banquet staff members to finish a banquet job more quickly due to efficient work habits, because the length of the banquet "depends on how good a time the banqueters are having." *See id.* Plaintiff's argument that MHS's payment structure fails to constitute a commission because it lacks an incentive aspect is, therefore, disconnected from the realities of the event industry. The Court finds that Plaintiff's share of the service charge is a commission within the meaning of § 207(i) despite not bearing incentive-based characteristics.

In conclusion, Defendants are entitled to summary judgment because there is no genuine dispute of material fact that Plaintiff is an exempt employee under § 207(i), *i.e.*, that the § 7(i) retail-or-service exemption applies to Plaintiff in that all three of its elements are satisfied. First, as explained in detail above, for purposes of the analysis under § 207(i) in this case, MHS's business at the Gaylord is the relevant "establishment," Plaintiff is an "employee of" such establishment, and such establishment meets the criteria required to be considered a "retail or service establishment." Second, Plaintiff was paid 1.5 times the minimum hourly rate applicable under Section 206 of the FLSA. And third, more than half of Plaintiff's compensation for the representative period not less than one month represents a commission on services.[34] With all three elements of the § 7(i) retail-or-service exemption thus being established with respect to Plaintiff as a matter of law based on undisputed facts, Defendants are entitled to summary judgment. It necessarily follows that

---

[34] Because the Court finds that the § 7(i) retail-or-service exemption applies to Plaintiff, it need not address Defendants' willfulness argument.

Plaintiff's motion for summary judgment must be denied because it mirrors Defendants' and takes the directly opposite stance.[35]

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants' motion for summary judgment (Doc. No. 209) will be GRANTED and, for the same reasons, Plaintiff's motion for summary judgment (Doc. No. 206) will be DENIED.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[35] The Court is aware that the outcome of this case is peculiar in that Defendant have prevailed despite the Court's favoring Plaintiff's position over their position on a key issue. Although the Court rejected Defendants' argument that the Gaylord is the proper "establishment" for the purposes of § 207(i), Defendants have nonetheless succeeded under the law. And in fact, in determining that MHS's business at the Gaylord is the proper "establishment," the Court is agreeing with Plaintiff's position (based on the Court's understanding of Plaintiff's ultimate position—which is presented in a confusing manner, as discussed above—as to what the proper establishment is). Nonetheless, as discussed, Plaintiff has failed to persuade the Court on several key issues, ultimately leading the Court to find that summary judgment for Defendants is warranted. Ultimately, the Court is satisfied that it has fully considered the parties' arguments and construed their positions fairly.